IN THE UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF NEBRASKA

```
MARY A. CAMRON,                )
                               )
           Plaintiff,          )            8:12CV229
                               )
       v.                      )
                               )
CAROLYN W. COLVIN,             )       MEMORANDUM OPINION
Acting Commissioner of Social  )
Security Administration,       )
                               )
           Defendant.          )
_____)
```

This matter is before the Court for judicial review of a final decision of the defendant Acting Commissioner of the Social Security Administration ("Commissioner") pursuant to 42 U.S.C. § 405(g) of the Social Security Act.  The Commissioner denied plaintiff's application for a period of disability and disability insurance benefits, finding plaintiff was not under a disability at any time from the amended alleged onset date, October 1, 2008, to the date last insured, December 31, 2010. Upon review, the Court finds the Commissioner's decision is not supported by substantial evidence in the record as a whole and should be vacated and remanded for further findings consistent with this memorandum opinion.

**I.  Background and Procedural History**.

As an initial matter, it must be noted that although the Administrative Law Judge ("ALJ") found that Ms. Camron had several severe impairments, namely, "diabetes and degenerative

disc disease.  Mental – mood disorder, post-traumatic stress disorder, personality disorder not otherwise specified, and polysubstance dependence in partial remission" (Tr. 21), Ms. Camron is primarily challenging the Commissioner's determination that her mental disabilities do not render her disabled (Tr. 1033, 1040).  The Court, likewise, will consider Ms. Camron's mental impairments.  Because Ms. Camron has amended her alleged onset date to October 1, 2008 (Tr. 1032), the Court will focus its review on Ms. Camron's medical history and other pertinent facts relating to her alleged impairments from October 1, 2008, forward.

Ms. Camron was previously awarded disability benefits on May 1, 2001, but the award ceased in May 2004 due to medical improvement.  Ms. Camron applied for this second round of disability benefits on October 27, 2004.  In connection with her application, on March 11, 2005, Ms. Camron was evaluated by Linda Schmechel, Ph.D., a state agency reviewing provider, who completed a Psychiatric Review Technique (Tr. 404-417) based on the information then available in Ms. Camron's record, but not on an examination of Ms. Camron.[1]  Dr. Schmechel based her medical disposition on the categories of affective disorders

_____

[1] Dr. Schmechel's evaluation occurred over three years prior to Ms. Camron's amended alleged onset date, October 1, 2008. Nevertheless, because the ALJ gave "substantial weight" to Dr. Schmechel's evaluation in the opinion under review, the Court will consider the evaluation as well.

-2-

("depression"), personality disorders ("borderline, histrionic"), and substance addiction disorders ("Abuse at present.  Somewhat in Remission") (Tr. 404).  Dr. Schmechel stated that Ms. Camron had no limitations regarding restrictions of daily living, and moderate limitations as to difficulties in maintaining social functioning and concentration, persistence, or pace (Tr. 414). Dr. Schmechel found that Ms. Camron had had one or two episodes of decompensation, each of extended duration (*Id.*).

On March 17, 2005, the Commissioner denied Ms. Camron's October 2004 claim initially (Tr. 65), and on June 10, 2005, the Commissioner denied the claim on reconsideration (Tr. 63).  An ALJ held a hearing on Ms. Camron's application on January 25, 2007 (Tr. 1075-1148), and denied benefits on November 15, 2007 ("2007 ALJ Decision," Tr. 53-62).

Ms. Camron appealed the 2007 ALJ Decision to the Appeals Council.  As part of her appeal, she included a psychological evaluation by Beverly Doyle, Ph.D., dated January 25, 2008, a little over eight months prior to the amended onset date ("2008 Doyle Report," Tr. 661-668).  Dr. Doyle personally examined Ms. Camron.  Dr. Doyle's DSM Multiaxial Classification included the following:  Axis I - Major Depressive Disorder, recurrent, Generalized Anxiety Disorder, and Polysubstance

-3-

dependence (by history); Axis II - Personality disorder with borderline features; Axis V - GAF 45[2] (Tr. 662).

Dr. Doyle stated that Ms. Camron had "extreme limitation" in the "ability to deal with work stress," defined as follows:  "There is major limitation in this area.  There is no useful ability to function in this area" (Tr. 663).  Similarly, Dr. Doyle reported that Ms. Camron was extremely limited in "the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods," and in "the ability to accept instructions and respond appropriately to criticism from supervisors or co-workers" (Tr. 664).  Dr. Doyle stated that Ms. Camron was moderately limited in "the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances" (*Id.*).

On September 25, 2008, Ms. Camron was admitted to Lasting Hope Recovery Center, a psychiatric facility, on transfer from an emergency room, after cutting herself on the wrist (Tr.

---

[2] "The GAF is a numeric scale ranging from zero to one hundred used to rate social, occupational and psychological functioning 'on a hypothetical continuum of mental health-illness.'"  *Pate-Fires v. Astrue*, 564 F.3d 935, 937 n.1 (8th Cir. 2009) (quoting *Diagnostic and Statistical Manual of Mental Disorders*, 32 (4th ed. Am. Psychiatric Ass'n 1994) (DSM IV)).

955).  Upon admission, psychiatrist Roger Pentzien, MD, noted
that Ms. Camron had a laceration "with 13 stitches [in the] left
wrist" (Tr. 958).  Dr. Pentzien listed Ms. Camron's diagnoses
upon admission as follows:  Axis I - Mood disorder, marijuana
abuse versus alcohol abuse depression; Axis II - deferred; Axis V
- GAF 20 (*Id.*).  Upon discharge five days later, Dr. Pentzien
listed Ms. Camron's diagnoses as follows:  Axis I - Mood
disorder, not otherwise specified, Polysubstance abuse (cannabis
and alcohol); Axis II - Deferred; Axis V - GAF 55 (Tr. 949).  Dr.
Pentzien stated that the prognosis was fair (Tr. 952).

        Following her stay at Lasting Hope, Ms. Camron received
treatment on several occasions in late 2008 - 2009 from
psychiatrist Rajeev Chaturvedi, MD, at Lutheran Family Services.
At the initial evaluation on November 5, 2008, Dr. Chaturvedi
listed Ms. Camron's diagnoses as follows:  Axis I - Bipolar I
Disorder with psychotic features; Axis II - Deferred; Axis V -
GAF 40 (Tr. 1022).  Dr. Chaturvedi prescribed several medications
for Ms. Camron and recommended follow up in four weeks (*Id.*).

        In the next office visit note, dated January 6, 2008
[sic; apparently 2009], Dr. Chaturvedi states that Ms. Camron
"was clearly overwhelmed.  Her speech was pressured.  Mood
anxious, depressed.  Affect was liable.  Thought process was
marked with flight of ideas" (Tr. 1023).  Dr. Chaturvedi noted
Ms. Camron's "severe financial problems" in obtaining her

-5-

medications (*Id.*).  Dr. Chaturvedi listed Ms. Camron's diagnoses
as follows:  Axis I - Bipolar I Disorder with psychotic features;
Axis II - Deferred; Axis V - GAF 40 (Tr. 1024).

On March 11, 2009, Dr. Chaturvedi again describes the
financial difficulties Ms. Camron was experiencing in acquiring
the medications that he had prescribed for her (Tr. 1019).  Dr.
Chaturvedi listed Ms. Camron's diagnoses as follows:  Axis I -
Bipolar I Disorder with psychotic features; Axis II - Deferred;
Axis V - GAF 40 (Tr. 1019).

On May 13, 2009, Dr. Chaturvedi states that Ms. Camron
"reports continuing having occasional auditory hallucinations -
command in nature but command does not involve instructions to
hurt herself or others" (Tr. 1018).  Dr. Chaturvedi listed Ms.
Camron's diagnoses as follows:  Axis I - Bipolar I Disorder with
psychotic features; Axis II - Deferred; Axis V - GAF 40-45 (*Id.*).

On June 10, 2009, Dr. Chaturvedi states that Ms. Camron
is "getting treatment for Bipolar Type I Disorder with psychotic
features" (Tr. 1017).  He states, "She continues to have auditory
hallucinations of derogatory abusive language using voice calling
her name" (*Id.*).  "She also has significant paranoia and
interprets regular behavior of other people with paranoid things
as people are talking about her" (*Id.*).

On July 22, 2009, Dr. Chaturvedi states that Ms. Camron
is "getting treatment for Bipolar Type I Disorder with psychotic

-6-

features" (Tr. 1016).  He states, "She has had auditory hallucinations in the past, cutting behavior, multiple suicide attempts and disassociated behavior.  The patient reports that she has very little or no idea of the incidents such as cutting on hand or jumping out of the vehicle at 20-30 mph or falls that she has sustained injury from" (*Id.*).  "She and her family, including her boyfriend, are concerned about these things and the risk of injury" (*Id.*).

The last office visit note is dated August 19, 2009, wherein Dr. Chaturvedi states that Ms. Camron is "getting treatment for Bipolar Type I Disorder with psychotic features" (Tr. 1015).  He again describes some of Ms. Camron's financial difficulties in obtaining her medications (*Id.*).  A Lutheran Family Services administrator later reported that Ms. Camron was later "discharged [from Lutheran Family Services treatment] due to no shows for appointments and non-payment for services" (Tr. 1014).

On June 23, 2010, the Appeals Council remanded the 2007 ALJ Decision (Tr. 29-33).  As part of the remand process dictated by the Appeals Council, Ms. Camron was evaluated for both physical and psychological disability.  On August 19, 2010, the physical examiner, Meryl Severson II, MD, diagnosed Ms. Camron with diabetes mellitus, stable degenerative disc disease, bipolar

-7-

personality disorder, history of drug and alcohol abuse, and other less significant problems (Tr. 671).

In a report dated August 22, 2010, the psychological examiner, Lindsey Hauser, Psy.D., stated that Ms. Camron reported that she was no longer taking her psychiatric medications due to financial problems (Tr. 680). Dr. Hauser stated, "Ms. Camron appears to suffer from moderate restriction in activities of daily living due to mood dysregulation and past traumas" (Tr. 681). "It appears that Ms. Camron's behavioral, emotional, and social functioning will deteriorate with distress and change in her environment as her history suggests past hospitalizations due to increased stressors" (*Id.*). "Ms. Camron's ability to carry out short and simple instructions under ordinary supervision appears to be below average given her observed poor memory" (*Id.*). "If Ms. Camron were to be awarded funds by the state, given her history of substance use, she ought to be granted a payee" (*Id.*).

Dr. Hauser noted that Ms. Camron had moderate limitations in the ability to make judgments on simple and complex work-related decisions and the ability to interact appropriately with supervisors and coworkers (Tr. 683). Otherwise, her limitations were noted as mild (*Id.*).

Dr. Hauser listed Ms. Camron's diagnoses as follows: Axis I - posttraumatic stress disorder, R/O mood disorder, NOS,

-8-

alcohol, cannabis, and methamphetamine dependence in full remission (by report); Axis II - R/O borderline personality disorder; Axis V - GAF 60 (Tr. 681).  Dr. Hauser stated, "The prognosis for Ms. Camron is fair with proper mental health services and medication compliance" (*Id.*).

Ms. Camron was seen on three occasions in October and November 2010 for therapy at Heartland Counseling Services (Tr. 993-1008).  On the first occasion, October 20, 2010, the precipitating problem was listed as "Mood swings - bi-polar" and the precipitating event was listed as "Does not have meds" (Tr. 1001).[3]  In the interpretive summary, the practitioner stated, "Mary reports she needs her medication to prevent relapse as she tends to self-medicate w/alcohol & illegal drugs" (Tr. 1007).  "Mary is supportive of a referral to community support, as she is in need of assistance with transportation, housing, med management, and med assistance.  Mary reports she feels she is losing hope and feels her symptoms worsening" (*Id.*).  The practitioner recommended outpatient mental health care, community support services (crisis), a psychiatric referral, and a voc/rehab agency (Tr. 1008).  The practitioner listed Ms. Camron's diagnoses as follows:  Axis I - Bipolar + most recent

---

[3] Two mental health practitioners signed the interview report, but neither signature is legible.

depression, severe with psychotic features; Axis II - Deferred; Axis V - GAF 30 (*Id.*).

On October 28, 2010, Ms. Camron was seen again at Heartland Counseling Services for therapy.  The progress note states, "Mary discussed & processed the symptoms of bipolar and her need for medication.  Mary appears insightful as she identifies her need for meds and need for housing to reduce chaos" (Tr. 998).  Finally, after a visit on November 17, 2010, the treatment plan stated that Ms. Camron's presenting problem was "Hearing voices - medications someone to talk to, figure things out, anger, frustration, mood swing, social skills, crying" (Tr. 994).  Referrals for additional services included psychiatric, community support, and voc/rehab (Tr. 995).

On November 19, 2010, just a few weeks before the remand hearing, Ms. Camron was again evaluated by Beverly Doyle, Ph.D. ("2010 Doyle Report," Tr. 982-991).  Dr. Doyle personally examined Ms. Camron.  Dr. Doyle's DSM Multiaxial Classification this time included the following:  Axis I - post traumatic stress disorder, cannabis and alcohol abuse in early full remission, polysubstance dependence in full remission, major depressive disorder, recurrent, severe with psychotic features; Axis II - personality disorder with borderline features; Axis V - GAF 55 (Tr. 984).

-10-

Again, Dr. Doyle stated that Ms. Camron had "extreme limitation," defined as "There is major limitation in this area. There is no useful ability to function in this area" in the "ability to deal with work stress" (Tr. 989). Similarly, Dr. Doyle reported that Ms. Camron was extremely limited in "the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods" and "the ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes" (Tr. 990, 991). Dr. Doyle stated that Ms. Camron was markedly limited in "the ability to accept instructions and respond appropriately to criticism from supervisors or co-workers," "the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances," and "the ability to interact appropriately with the general public" (Tr. 990, 991). Dr. Doyle indicated that Ms. Camron has "marked difficulties in maintaining concentration, persistence, or pace resulting in failure to complete tasks in a timely manner (in work setting or elsewhere)" (Tr. 991).

A different ALJ held the remand hearing on Ms. Camron's application on November 29, 2010 (Tr. 1025-1074). At the hearing, Ms. Camron amended her onset date for her alleged onset of disability to October 1, 2008 (Tr. 1032).

-11-

Ms. Camron was born on March 19, 1971.  At the time of the 2010 ALJ remand hearing, she was separated from her husband (Tr. 1035).  Her three children were ages twenty-two, twenty, and eighteen in 2010 (Tr. 1036).  Ms. Camron did not raise the children; the two oldest were raised by their father (not Ms. Camron's husband), and the youngest was in the care of Ms. Camron's sister at the time of the hearing because Ms. Camron had been determined to be mentally unstable (*Id.*).

Ms. Camron dropped out of high school but eventually earned her GED as an adult (Tr. 1035).  Ms. Camron testified that she has never held a steady job; the longest she had held a job was about six months (Tr. 1037).  She has worked as a cook, a bartender, and a "CAN" [sic - likely CNA] (nursing) (Tr. 1037-38, 1042).  Ms. Camron testified that she has been hospitalized several times for suicide attempts (Tr. 1038-41).  Although Ms. Camron has had problems with drugs and alcohol in the past, she testified that she had not been using drugs and alcohol since the amended alleged onset date, October 1, 2008 (Tr. 1041).

Ms. Camron did work briefly after the alleged onset date in 2009, at the Scoreboard Restaurant, but she testified that she was fired "because I was throwing things around the kitchen.  I don't remember throwing nothing around the kitchen but that's what Diana told me I did and she don't work there anymore" (Tr. 1042).  The Chairman of the Board of the Scoreboard

-12-

Restaurant, Homer Uehling, signed a work performance assessment, stating that neither of Ms. Camron's supervisors, including Diana, still work there, and that he was satisfied with Ms. Camron's work and would rehire her (Tr. 283-87). Yet Ms. Camron testified that she "hardly ever seen" Mr. Uehling and that he only came in when something needed to be fixed (Tr. 1042, 1049). After that, she "started cooking for Pheasant Bonanza" but "couldn't handle the stress and they were expecting way too much from one person" (Tr. 1043).

Ms. Camron lives with her brother and other relatives, thirteen people, "all bipolar" (Tr. 1045). Her only benefit is food stamps (Tr. 1042). She occupies herself all day by mostly staying in her room but sees her boyfriend in a mental institution once a week (Tr. 1045). She helps a bit with the housework (*Id.*). Ms. Camron testified that when she takes her psychiatric medications, "I was on meds for awhile and I was still going through the same thing I'm going through" (Tr. 1072).

Also testifying at the 2010 remand hearing was Dr. Thomas England, a medical expert. Dr. England performed a review of Ms. Camron's record as provided to him by the Commissioner; he had "not had any contact with" Ms. Camron and was testifying from a remote location (Tr. 1054, 1028). Dr. England testified that he had reviewed the record up through Exhibit 35F, which included the records from Ms. Camron's Lasting Hope admission in September

-13-

2008 (Tr. 2051).  Thus Dr. England had not reviewed the 2008-2009 records from Lutheran Family Services (Dr. Chaturvedi, Exhibit 37F) or the 2010 records from Heartland Counseling Services (Exhibit 36F), because these records were received by the ALJ on December 21, 2010, after the hearing (Tr. 1009, 995). Consequently, Dr. England testified that "the first difficulty I would have is that she from [October] of '08 to the present, of course I don't have any mental health treatment notes other than the two CE's in the record, so other than those I don't have much information to go on formally" (Tr. 1052).  Dr. England repeated this opinion later in his testimony: "Well of course since then [October 2008] we've only had two as CE's, two episodes or instances of mental health contact" (Tr. 1063).

Nevertheless, Dr. England gave his opinion in a narrative fashion: "With respect to diagnosis I would say that the record certainly historically reflects a diagnosis in several categories, I would consider 12.04 affective disorder (Tr. 1052). "And if we look . . . 12.08 personality disorder which I think is probably primary and 12.09 substance abuse disorders" (Tr. 1053). "With respect to the 12.04 condition, the record reports really has [sic] not indicated a bipolar mood disorder with any degree of regularity" (*Id.*).  "I suspect based on the overall record that the mood disorder is likely the diagnosis" (*Id.*).

-14-

As to Ms. Camron's limitations, Dr. England stated, "I would say activities of daily living appear to be generally mildly impaired certainly historically, more so of course with substance use" (Tr. 1056-57).  "Social functioning I would say appears to be moderately impaired, again, more so with substance use it would appear" (Tr. 1057).  Dr. England testified that none of the criteria showed marked limitations "if she's in treatment and not using" (*Id.*).  Dr. England stated he would not give great weight to the extreme limitations noted by Dr. Doyle because in his opinion, Ms. Camron's functioning was higher when in treatment and abstinent, and the extreme limitations were inconsistent with Dr. Doyle's 2010 GAF of 55 (Tr. 1058).  Dr. England said he would disregard Dr. Doyle's extreme limitations "without any other information" (*Id.*).  Dr. England stated that there had been "some" low GAF scores but "I don't know if I would say multiple" (Tr. 1059).  Dr. England testified that Ms. Camron could "definitely" handle unskilled work with limited social interaction when in treatment (*Id.*).

Next, a vocational expert testified at the hearing. The ALJ posed a hypothetical for a person with a few enumerated physical limitations and

> then from a mental standpoint
> please consider only unskilled
> work, . . . work that is routine
> and repetitive, does not require
> extended concentration or
> attention; doesn't require dealing

-15-

> with job changes or setting goals.
> And social interaction is no more
> than occasional, it can be brief or
> superficial, up to occasional with
> co-workers, supervisors, and
> general public

(Tr. 1066).  The vocational expert identified thousands of such jobs "in the four state region" (Tr. 1067), as well as thousands of such jobs with a sedentary physical limitation (Tr. 1068).

Ms. Camron's representative also posed two hypotheticals to the vocational expert.  The first was to

> assume for the non-exertional
> limitation the claimant has a
> marked limitation which is defined
> as a serious limitation in this
> area.  There is a substantial loss
> in the ability to effectively
> function.  Assume that that
> limitation is markedly limited in
> the ability to deal with work
> stress, which includes the normal
> pace of work expected by employers
> with deadlines, quotas, and so
> forth.  The person has a marked
> limitation in the ability to handle
> work stresses described . . .

(Tr. 1069).  The vocational expert stated that these limitations "would eliminate all occupations" (*Id.*).  Next, the representative asked the vocational expert to assume

> there's a marked limitation in the
> ability to complete a normal work
> day and a work week without
> interruptions from psychologically
> based symptoms and to perform at a
> consistent pace without an
> unreasonable number and length of
> rest periods.  Would that affect

-16-

> her ability to do past work or
> other work?

(Tr. 1070).  The vocational expert answered, "Yes" (*Id.*).

On February 9, 2011, the second ALJ also issued an unfavorable opinion affirming the denial of Ms. Camron's disability claims ("2011 ALJ Decision," Tr. 18-28).  The ALJ evaluated Ms. Camron's claim under the Commissioner's five-step sequential process.  *See* 20 C.F.R. § 404.1520(a).  At step one, the ALJ found that Ms. Camron had not engaged in substantial gainful activity from her amended alleged onset date, October 1, 2008, through her date last insured, December 31, 2010 (Tr. 20).

At step two, the ALJ found that Ms. Camron's impairments, diabetes, degenerative disc disease, mood disorder, post-traumatic stress disorder, personality disorder not otherwise specified, and polysubstance dependence in partial remission, were severe (Tr. 21).  The ALJ also noted, "the claimant testified she is alleging disability primarily due to her mental impairments, which are listed above as severe impairments" (*Id.*).

At step three, the ALJ found that Ms. Camron's impairments, singly or in combination, did not meet one of the listed impairments found in 20 C.F.R. Part 404, Subpart P, Appendix 1 (*Id.*).

Next, the ALJ determined that Ms. Camron had a residual functional capacity

-17-

> to lift and carry 20 pounds
> occasionally and 10 pounds
> frequently; stand, sit, or walk for
> 6 hours in an 8-hour day; and
> occasionally climb, balance, stoop,
> kneel, crouch, and crawl.  She
> needed to avoid concentrated
> exposure to vibrations and hazards.
> Due to her mental impairments, the
> claimant was limited to unskilled
> work that is routine, repetitive,
> and does not require extended
> concentration or attention, dealing
> with job changes, or setting goals
> and involves social interaction
> that can be brief or superficial
> but no more than occasional with
> co-workers, supervisors, and the
> general public.

(Tr. 22-23).  While the ALJ found that Ms. Camron's "medically

determinable impairments could reasonably be expected to cause

the alleged symptoms," the ALJ found that Ms. Camron's

"statements concerning the intensity, persistence, and limiting

effects of these symptoms are not credible to the extent they are

inconsistent with the above residual functional capacity

assessment" (Tr. 23-24).

The ALJ then summarized the various medical reports in

the record, including several from before the amended alleged

onset date, and also including those from Dr. Chaturvedi and

Heartland Counseling Services that had not been available to Dr.

England at the hearing.  In particular, the ALJ stated that the

2008 and 2010 Doyle Reports, including the opinion that "the

claimant's mental impairments caused moderate, marked, and

-18-

extreme limitations in functioning" were "not consistent with the evidence or the overall record," and so Dr. Doyle's opinions "[are] not given great weight" (Tr. 25).

After summarizing the opinion of the testifying medical expert, Dr. England, the ALJ stated, "Dr. England did not agree with Dr. Doyle's opinion because historically with treatment and abstinence the claimant's functioning has been higher and extreme limitations are inconsistent with the GAF scores of record" (Tr. 26).  In addition, "Dr. Hauser's assessment is given some weight but more weight is given to Dr. England's expert medical opinion because it is based on his review of the entire record and it is supported by his professional expertise and the record as a whole" (*Id.*).

Even though Dr. Schmechel's report dated from 2005, more than three years before the amended alleged onset date, the ALJ stated, "The State agency psychological consultant Linda Schmechel, Ph.D., determined that the claimant's mental impairments caused no more than moderate functional limitations" (Tr. 26).  "Her assessment is consistent with the record both at the time of her review and through the date of this decision, It is given substantial weight" (*Id.*).

Finally, as to Ms. Camron's work performance, the ALJ gave the evaluation by Mr. Uehling substantial weight.  While noting that "the claimant testified that she rarely saw Mr.

-19-

Uehling," the ALJ stated that "there is no persuasive evidence from additional employment sources indicating her work performance was not adequate in the past" (Tr. 26).  Despite this statement, at step four, the ALJ found that Ms. Camron was unable to perform any past relevant work (*Id.*).

At step five, the ALJ found that "considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed" (Tr. 27).  Consequently, the ALJ concluded the unfavorable decision by stating, "The claimant was not under a disability, as defined in the Social Security Act, at any time from October 1, 2008, the alleged onset date, through December 31, 2010, the date last insured" (Tr. 28).

On February 16, 2011, Ms. Camron requested review of the 2011 ALJ Decision by the Appeals Council (Tr. 13).  On May 9, 2012, the Appeals Council declined Ms. Camron's request for review (Tr. 7); thus the 2011 ALJ Decision is now the final decision of the Commissioner.  Ms. Camron timely filed a complaint with the United States District Court for the District of Nebraska on July 2, 2012, for review of the February 9, 2011, ALJ decision (Filing No. 1).

## II.  **Standard of Review**.

When reviewing an ALJ's decision, the Court "must determine 'whether the ALJ's decision complies with the relevant legal requirements and is supported by substantial evidence in the record as a whole.'" *Martise v. Astrue*, 641 F.3d 909, 920 (8th Cir. 2011) (quoting *Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010)).  "Substantial evidence" is:

> relevant evidence that a reasonable mind might accept as adequate to support a conclusion.  Substantial evidence on the record as a whole, however, requires a more scrutinizing analysis.  In the review of an administrative decision, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight.  Thus, the court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory.

*Id.* at 920-21.  "'If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision.'" *Partee v. Astrue*, 638 F.3d 860, 863 (8th Cir. 2011) (quoting *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005)).  The Court may not reverse the ALJ's decision "simply because [the Court] would have come to a different conclusion." *Teague v. Astrue*, 638 F.3d 611,

614 (8th Cir. 2011) (citation omitted).  "The claimant bears the burden of proving disability." *Id.* at 615.

Residual Functional Capacity ("RFC") is the most a claimant can do despite physical and mental limitations caused by her impairments, including any related symptoms. 20 C.F.R. § 404.1545(a).  "RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis," which means "8 hours a day, for 5 days a week, or an equivalent work schedule." S.S.R. 96-8p, 1996 WL 374184, at *2 (Soc. Sec. Admin. July 2, 1996) (emphasis removed).  "The ALJ should determine a claimant's RFC based on all the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of [her] limitations." *Davidson v. Astrue*, 578 F.3d 838, 844 (8th Cir. 2009) (quoting *Lacroix v. Barnhart*, 465 F.3d 881, 887 (8th Cir. 2006)).

## III.  Discussion.

On appeal, Ms. Camron asserts three primary arguments: (1) "the ALJ did not give adequate consideration to the numerous GAF scores of 45 and below even while Plaintiff was receiving treatment and medication" (Filing No. 19, at 11); (2) the ALJ's reliance on the opinion of "paper-review physician Dr. Schmechel (which predated Plaintiff's alleged onset date by over three years)" and on the opinion of "paper-review medical advisor (Dr.

England) who appeared at hearing" was "inappropriate" (Tr. 13-14); and (3) the ALJ did not consider all the factors that would go into Ms. Camron's compliance or non-compliance with treatment recommendations (Filing No. 19, at 14).  Because the Court finds substantial evidence does not support the weight given by the ALJ to the opinions of Drs. Schmechel and England in the development of Ms. Camron's RFC, the Court does not address Ms. Camron's remaining arguments.

The Court first notes that the Appeals Council directed, "Upon remand the [ALJ] will: . . . Obtain evidence from a medical expert specializing in mental health to clarify the nature and severity of the claimant's mental impairments" (Tr. 32).  Consequently, Dr. Hauser evaluated Ms. Camron in August 2010, post-remand.  Yet the ALJ then only afforded Dr. Hauser's opinion "some weight" in favor of Dr. England's opinion (Tr. 26).  As a medical expert, Dr. England had performed a review of Ms. Camron's record only.  Unlike Dr. Hauser, he "had never had any contact with" Ms. Camron and, since he was testifying from a remote location, did not observe her personally when she testified on the day of the hearing (Tr. 1054, 1028).

More importantly, Dr. England's opinion was based on a factually inaccurate conclusion:  the very first sentence of his testimony reads, "Yes, the first difficulty I would have is that she from [October] of '08 to the present, of course I don't have

-23-

any mental health treatment notes other than the two CE's [court-ordered reports from Drs. Severson and Hauser] in the record, so other than those I don't have much information to go on formally" (Tr. 1052). Dr. England emphasized this fact later in his testimony (Tr. 1063). As noted above, this inaccuracy is due to the unfortunate fact that Dr. England could not review the records from Lutheran Family Services (Dr. Chaturvedi, Exhibit 37F) or Heartland Counseling Services (Exhibit 36F), because these records were not provided to the ALJ until December 21, 2010, after the hearing (Tr. 1009, 995). As a result, as far as Dr. England was aware, Ms. Camron sought no treatment after her September 2008 admission to Lasting Hope, where she had presented with thirteen stitches in her wrist (Tr. 958).

Yet unbeknownst to Dr. England, Ms. Camron saw Dr. Chaturvedi on an ongoing basis for many months after October 2008. Even while in treatment and on medications prescribed by Dr. Chaturvedi, Ms. Camron continued to experience psychiatric symptoms, including auditory hallucinations, and to be assessed GAF scores in the 40's.

Dr. England also concluded, "With respect to the 12.04 condition, the record reports really has [sic] not indicated a bipolar mood disorder with any degree of regularity" (Tr. 1053). This statement is similarly questionable when considered in the context of the record as a whole, that is, with treating

-24-

psychiatrist Dr. Chaturvedi's repeated diagnosis of "Bipolar I Disorder with psychotic features" (Tr. 1022, 1024, 1019, 1018, 1017, 1016, and 1015).  Finally, Dr. England indicated that there had been "some" low GAF scores but "I don't know if I would say multiple" (Tr. 1059).  Yet Dr. Chaturvedi assessed Ms. Camron with GAF scores in the 40's on multiple occasions, as noted above.

In the discussion regarding the formulation of Ms. Camron's RFC, the ALJ stated, "Dr. England did not agree with Dr. Doyle's opinion because historically with treatment and abstinence the claimant's functioning has been higher and extreme limitations are inconsistent with the GAF scores of record" (Tr. 26).  The Court cannot say whether or not this statement would hold true had Dr. England had access to Dr. Chaturvedi's records (and to the records from Heartland Counseling Services).  In addition, the ALJ stated, "Dr. Hauser's assessment is given some weight but more weight is given to Dr. England's expert medical opinion because it is based on his review of the entire record and it is supported by his professional expertise and the record as a whole" (*Id.*).  This statement is problematic, since Dr. England's opinion is not, in fact, based on a "review of the entire record."  Again, the Court cannot say whether Dr. England's testimony that Ms. Camron could "definitely" handle unskilled work with limited social interaction when in treatment

-25-

would change had he had the opportunity to review the entire record, including the records reflecting the times when Ms. Camron was actually in treatment with Dr. Chaturvedi and Heartland Counseling Services.  Thus, the Court finds that remand is warranted.

The ALJ also gave great weight to Dr. Schmechel's 2005 report, which was formulated more than three years before the amended alleged onset date.  Like Dr. England's opinion, Dr. Schmechel's report obviously did not address any of the medical reports from October 1, 2008, onward, including that of Dr. Chaturvedi.  The Court finds that the ALJ did not adequately explain why the dated opinion of Dr. Schmechel should be given greater weight than that of Dr. Doyle, who examined Ms. Camron twice, and Dr. Hauser, who examined Ms. Camron at the behest of the Appeals Council.

Based on the foregoing, the Court finds that the ALJ's development of Ms. Camron's RFC is not supported by substantial evidence based on the record as a whole.  Further analysis of Ms. Camron's claim is necessary to determine whether she is capable of full-time work.  Accordingly, the Court will remand the matter for further findings.

## IV.  Conclusion.

The Commissioner's decision is vacated, and this matter is remanded for further findings consistent with this opinion.  A

-26-

separate order will be entered in accordance with this memorandum opinion.

DATED this 24th day of June, 2013.

BY THE COURT:

/s/ Lyle E. Strom

_____

LYLE E. STROM, Senior Judge
United States District Court

-27-